UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| SARA RUTHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:14-CV-599-PLR-CCS |
| | ) | |
| BABCOCK & WILCOX TECHNICAL | ) | |
| SERVICES Y-12 LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff, Sara Ruther, brings this action against her former employer, Babcock & Wilcox Technical Services Y-12 LLC (B&W Y-12), alleging she was terminated from her position as a welding apprentice because of gender discrimination, pregnancy discrimination, and retaliation in violation of Title VII.

Presently before the court is B&W Y-12's motion for summary judgment [R. 23]. B&W Y-12 contends that Ruther cannot establish a claim for gender or pregnancy discrimination, or for retaliation. Alternatively, B&W Y-12 states it has presented legitimate, nondiscriminatory reasons for its decision to terminate Ruther from the welder Apprenticeship Program. B&W Y-12 contends Ruther did not demonstrate the knowledge, skills, and ability needed to continue her employment, and she was terminated. Therefore, Ruther cannot establish that she was terminated because of her gender, pregnancy, or because she made a complaint of discrimination to management.

B&W Y-12 asks the court to grant it judgment as a matter of law on all of Ruther's claims.

Ruther has responded in opposition to the motion [R. 25]. Ruther contends that there are material issues of fact regarding her employment and termination, and that a jury should decide whether B&W Y-12 discriminated against her when it terminated her employment.

## I. Facts

Ruther and Joseph Riordan were hired by B&W Y-12 as welding apprentices in October 2008. Plaintiff was the only female ever to be employed as a welder or welding apprentice at Y-12. The Apprenticeship Program was designed to train craft personnel using an on-the-job learning program and related instruction. The Joint Apprentice Training Committee (JATC) was formed to oversee the Apprenticeship Program and was comprised of six B&W Y-12 employees – three members of management and three members of the Atomic Trades and Labor Council (Union). If an apprentice was not meeting performance standards, it was the responsibility of the JATC to place the employee on a Performance Improvement Plan (PIP). If the PIP was not successful, the JATC could vote to terminate the employee's Apprenticeship Agreement, which would result in a termination of employment.

The welding apprentices were required to take classes, shadow journeymen, and complete on-the-job training on a variety of topics during the 5-year program. The related instruction included work in various textbooks as well as hands-on welding training in the welding booth. Ruther and Riordan did not begin actual welding until

2

2010. To facilitate their hands-on training, the welding apprentices were provided with a Welder Apprentice Training Program. The program was comprised of seven exercises, each of which involved different types of welding, and was designed to take an individual with no welding experience and provide them with the training necessary to weld at Y-12. Travis Scott, a certified welding inspector and union steward, was responsible for providing Ruther and Riordan with welding training and inspecting their welds.

During their initial training, Ruther and Riordan were required to weld under Scott's supervision in the welding test shop. To access the test shop area, Ruther and Riordan were required to obtain a security clearance (Q clearance). Before welding outside the test shop, Ruther and Riordan had to obtain specific Y-12 certifications by taking Welding Procedure Qualification Tests. Once an apprentice obtained a Y-12 certification, the apprentice could perform welding procedures outside the welding test shop under the supervision of a journeyman. Apprentices rotated to different shops approximately every three months to learn different trades under the supervision of journeymen.

On June 28, 2010, Ruther submitted a Declaration of Pregnancy to B&W Y-12. Y-12's Industrial Hygiene Organization (IH) performed a reproductive hazard evaluation of Ruther's workspace. IH recommended that Ruther refrain from welding activities during her pregnancy and postpartum nursing period. Ruther did not suffer any loss in pay, benefits, or hours as a result of this recommendation. During her pregnancy, Ruther was able to accumulate on-the-job learning hours, perform work in the required textbooks, and shadow journeymen around the plant.

3

Ruther took leave under the Family and Medical Leave Act (FMLA) on multiple occasions during September, October, and November for varying reasons. By the end of December 2010, Ruther had used a total of 151 hours of FMLA leave. On each occasion, Ruther was reinstated to the same position with the same pay and benefits she was receiving prior to taking leave. Ruther took leave for the birth of her child beginning January 31, 2011. She returned to work on June 8, 2011, and was again reinstated to the same position with the same pay, benefits, and hours she had prior to taking leave. All employees who took leave for more than three months had to regain their Q clearance when they returned to work. When Ruther returned to work, she no longer had a Q clearance and was required to regain her clearance before accessing the welding test shop. Prior to taking leave, Ruther had not obtained any certifications which would allow her to weld in other locations at Y-12, so her welding was limited to the welding test shop. Ruther was able to accumulate on-the-job learning hours, perform work in the required textbooks, and shadow journeymen while she waited for her Q clearance to be reinstated.

On August 1, 2011, Ruther met with Beth Green, director of resource management. During this meeting, Green told Ruther that she would not be permitted to weld if she continued to breastfeed because of the potential risks to Ruther's newborn baby. Green told Ruther that if she did not stop breastfeeding, she may be required to go on leave.

The next day, August 2, 2011, Ruther called B&W Y-12's Ethics Hotline to complain about Green's decision not to allow her to weld while breastfeeding. On

4

August 11, 2011, IH performed an evaluation of the welding test shop and determined that Ruther would be able to weld safely and continue to breastfeed provided she utilized engineering controls and had her exposure monitored by IH. However, Ruther could not access the welding shop until she regained her Q clearance. By September 14, 2011, Ruther had regained her Q clearance, and she resumed welding on September 28, 2011. During the investigation and resolution of her complaint, Ruther did not suffer any loss in pay, benefits, or hours.

In December 2011, the JATC performed its annual apprentice evaluations. The JATC determined that Ruther fell below the required minimum number of on-the-job learning hours. Scott noted that Ruther was struggling to progress through the training manual. On March 5, 2012, Scott sent an email to John Mincy, supervisor of the Welding Test Center. Scott reported that Riordan had successfully completed all seven of the exercises in the training manual. However, Ruther had passed only the first exercise in the training manual. On April 7, 2012, Ruther went on FMLA leave for four weeks as a result of acute appendicitis.

Based on Ruther's lack of progress, the JATC determined that she needed to be placed on a PIP. The JATC recommended that Ruther be given 120 hours to complete the first two exercises. On May 2, 2012, Ruther met with Green and Scott. During this meeting, Green told Ruther that she was being placed on a PIP and needed to complete the first two exercises in the training manual. On May 7, 2012, Ruther began working with Scott on the PIP. She completed the first exercise, but failed to complete the second exercise within the time allotted. Green and Scott met with Janet Sexton and Olga

5

Henley from Labor Relations on June 5, 2012. During the meeting, Scott reported that Ruther had not completed the two exercises. As a result of Ruther's failure to complete the PIP, she was placed on paid administrative leave while a decision was made regarding her employment.

On June 21, 2012, the JATC met to discuss Ruther's failure to complete the PIP. Scott told the JATC that while Ruther made a valiant effort during the PIP period, she did not have the knowledge, skills, and ability to be a successful welder at Y-12. The JATC voted unanimously to terminate Ruther's apprenticeship. Green sent an email to members of B&W Y-12's management notifying them that the JATC voted to terminate Ruther's apprenticeship.

On July 3, 2012, Ruther called Tracy Nelson in the Ethics Office and stated that she was having "another issue at work." Ruther told Nelson that she felt she was being discriminated against based on her pregnancy. She complained that Scott "didn't like her," "didn't get in the booth with her and help her," "was sporadic in his teaching with her," "ignored her," "was dismissive of her," "was hypercritical of her without being constructive," "refused to respond to questions of how to improve her welding," "had an underlying tone of anger toward her," and did not treat Riordan in the same manner as he treated her.

Nelson contacted Labor Relations and asked that Ruther's employment not be terminated until after the Ethics Office completed its investigation. Nelson met with Scott and Green on July 19, 2012, to interview them regarding Ruther's allegations. Scott and Green explained that Ruther did not demonstrate the knowledge or skills

6

required to be a welder at Y-12. Following the investigation, Nelson determined that Ruther's complaint of discrimination was unsubstantiated. On August 14, 2012, B&W Y-12 management approved termination. On August 20, 2012, Henley and several other individuals met with Ruther to notify her that her employment was being terminated. Scott attended the meeting as Ruther's Union Steward. Ruther was terminated for failure to demonstrate satisfactory progress in the Welder Apprenticeship Program.

Ruther disputes that she was not making satisfactory progress in the Apprenticeship Program. According to company records, Ruther received a total of 51 evaluations during her employment with B&W Y-12. The evaluations were conducted by the journeymen Ruther worked with and by management personnel. Of these evaluations, three rated Ruther "exceptional," twenty-three rated her "above average," and twenty rated her "average." Six evaluations did not rate her in these categories.

Ruther states that due to her pregnancy and other medical issues, she was unable to weld for a period of 20 months, and after she returned from leave, her training was sporadic and inconsistent. Ruther further states that the only time she received consistent actual hands-on weld training was during the period she worked on the PIP. Ruther asserts that because Riordan did not become pregnant or engage in breastfeeding, he proceeded through his apprenticeship uninterrupted. According to Ruther, this gave him a significant advantage in that his skills did not deteriorate over time through lack of use. In addition, Ruther asserts Riordan was provided a significant number of "unofficial" hands-on actual welding training hours by the "good old boy" network at Y-12, and he received more consistent, prolonged hands-on training by Scott after Ruther became

7

pregnant and was not allowed to do any hands-on welding.  Ruther observed Riordan receiving "unofficial" hands-on welding training by journeyman Blaine Litton outside the welding test shop.

Terry Beach, a journeyman welder who worked with both Ruther and Riordan, testified that before Riordan was certified to weld outside the test shop, he was given additional training and allowed to weld outside the test shop, but the same opportunity was not given to Ruther.  Beach also testified that Ruther was not given an appropriate opportunity to learn the welding trade or treated in the same manner as Riordan.  Beach explained that in many of the union positions at Y-12, there is an "old boys club," mentality and many men do not feel women should be working in certain trades, such as welding.  Beach further testified that Ruther was not allowed to go to the test shop very often to gain hands-on experience with actual welding, and was fully capable of becoming a welder if given a fair opportunity.  When Ruther became pregnant and was not allowed to weld, Riordan's hands-on training schedule significantly increased because Scott spent more time with him.  Beach stated that he had "no doubt that if Sara Ruther were given the same opportunity as Joey Riordan, she would have been successful in completing the Apprenticeship Training Program."

Tracy Miller-Hoffman is a pipefitter and she began the Apprenticeship Program with Ruther.  She also testified that there is an "old boys club" mentality at Y-12, and some of the men resent females being in what they believe to be a "man's job."  She observed that women apprentices who work on crews are more often assigned to running tools or organizing tool boxes instead of being allowed to actually get hands-on

8

experience.  She further observed that men are given first preference in obtaining hands-on training if the choice is between a man and a woman apprentice.  "There is a significant amount of favoritism toward men as opposed to females working in the trades."  Female journeymen are "treated differently than other male employees with similar backgrounds and capabilities, and many of the men working in the trades at Y-12 look down on female workers and disrespect their abilities."  She observed Scott giving Riordan extra welding training outside the test shop prior to Riordan being certified to weld outside the test shop.

When presented with the PIP, Ruther testified she initially thought that Scott and Green recognized that she had not been given a consistent chance to weld, and they were giving her the opportunity to catch up.  She believed she would have full access to the weld shop and full access to her instructor.  Ruther complains that the PIP required her to complete all seven tasks in a total of 120 hours, or in half the time set out in the Welder Apprenticeship Training Program, and significantly less than the approximately 400 hours allotted to Riordan.  Further, Scott determined that she would have to start not on Task 6, which she had previously completed, but at the beginning of Task One on Step One.  Beach opined that "Sara was not given sufficient time after her return from her pregnancy to master the tasks given her.  This was very unfair to her and in my opinion she was set up to be terminated."  Ruther states she completed five out of the seven tasks assigned to her in the PIP and completed them in less time than Riordan.

## II. Motion to Strike

Defendant moves to strike paragraphs 5, 9, and 15 of Terry Beach's affidavit filed in response to the motion for summary judgment. Defendant states that during Beach's deposition, the parties learned these statements were not based on his own observations and personal knowledge, but rather were derived from statements made by co-workers. Thus, defendants assert that the statements are inadmissible hearsay and should be stricken from the record [R. 31].

The statements at issue are as follows:

5.      During Joey Riordan's apprenticeship and before he was certified to weld outside the Alpha I Weld Test Shop, he was given additional training and allowed to weld outside the Alpha I Weld Test Shop. This same opportunity to practice welding outside the Weld Test Shop was not given to Sara Ruther.

9.      From my observations, Sara was not given an appropriate opportunity to learn the welding trade or treated in the same manner that Joey Riordan was treated.

15.      When Sara became pregnant and was not allowed to weld, Joey Riordan's hands-on training schedule significantly increased from what it had been. Travis Scott was more available to him than he had been before. Travis spent more time with Joey and he received significantly more hands-on training than he had when Sara was there. This caused Joey's welding skills to increase tremendously.

[R. 25-2].

When questioned about his personal knowledge of statement 5, Beach testified that he never actually saw Riordan being given additional training. Instead, a co-worker, Blaine Litton, told him that he and Riordan were working together training.

As to statement 9, Beach testified that he saw Travis Scott and Riordan working together in the weld test shop in the evenings while Ruther was on maternity leave. However, he later admitted that his knowledge of the after-hours training was based on "talking with Joey and talking with Travis from time to time." Beach never actually saw them training in the evenings. Statement 15 also is based on the alleged after-hours training.

Because Ruther is offering these out-of-court statements to prove the truth of the matters asserted, they constitute hearsay under Federal Rule of Evidence 801(c). Ruther responds that the statements should be considered under the hearsay exclusion of Rule 801(d)(2)(D) as statements made by a party's agent or employee on a matter within the scope of employment. *See Grizzell v. City of Columbus Div. of Police,* 461 F.3d 711, 722 (6th Cir. 2006). Travis Scott was the B&W Y-12 employee responsible for providing Ruther and Riordan with welding training. Therefore, when he made statements to Beach concerning Riordan's training, he was speaking within the scope of his employment. Also, as part of the Apprenticeship Program, Ruther and Riordan were required to take classes, shadow journeymen, and complete on-the-job training. Blaine Litton was a journeyman welder who provided Riordan with on-the-job welding instruction. The court finds that any statements made by Litton and Riordan concerning Riordan's training were also within the scope of their employment with B&W Y-12. Both Litton and Scott were involved in giving the apprentices evaluations and controlling their work. In conclusion, the court finds that the statements in paragraphs 5, 9, and 15 of Beach's affidavit are not hearsay but are admissions made by employees concerning

11

matters within the scope of their employment under Rule 801(d)(2)(D). Defendant's motion to strike is **DENIED**.

### III.  Motion to Supplement Response

Ruther moves to supplement her response to B&W Y-12's motion for summary judgment with excerpts of the deposition of Leisa Pittman, a newly discovered witness [R. 53]. B&W Y-12 opposes the motion [R. 56]. Upon review of the motion as well as the deposition testimony of Leisa Pittman, the court will **DENY** Ruther's motion. Even if the court were to consider the testimony and arguments set forth in the supplemental brief, the court's analysis would be the same based on the record as it presently exists, and the supplement is merely cumulative of evidence already in the record.

### IV.  Standard for Summary Judgment

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 330 n. 2 (1986); *Moore v. Philip Morris Co., Inc.,* 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita elec. Indus. Co. Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Keifer*, 301 F.3d 937, 942 (6th Cir. 2002).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations.

12

*Celotex*, 477 U.S. at 317. To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the court search the record "to establish that it is bereft of a genuine issue of fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

## V. Gender Discrimination

B&W Y-12 asserts that Ruther cannot rely on any discrete acts of discrimination that occurred more than 300 days before she filed her charge of discrimination. Ruther filed her Intake Questionnaire and Affidavit with the EEOC on May 28, 2013. On December 4, 2013, she filed her charge alleging discrimination on the basis of sex, pregnancy, and retaliation. B&W Y-12 argues any alleged acts that occurred prior to August 1, 2012, cannot form the basis of a claim for gender/pregnancy discrimination or retaliation. Ruther's claim that she was not permitted to weld while pregnant and her

claim that Green threatened to place her on leave while breastfeeding are outside the charge period and cannot form the basis for a claim of discrimination or retaliation.

In her response, Ruther agrees that discrete acts falling outside the 300-day charge period are not actionable in and of themselves. Rather, she is only alleging her termination as an actionable claim, but asserts that the prior alleged discriminatory acts may be used as evidence to support her termination claim. Ruther is correct that these earlier acts of discrimination may support a timely claim. *See AMTRAK v. Morgan,* 536 U.S. 101, 113 (2002); *Austin v. City of Clarksville,* 244 Fed. Appx. 639, 650-51 (6th Cir. 2007) ("a plaintiff may introduce evidence of prior discriminatory acts as background evidence in support of a timely claim").

To establish a *prima facie* case of discrimination based on gender, a plaintiff must show that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently than similarly situated male employees. *Humenny v. Genex Corp.,* 390 F.3d 901, 906 (6th Cir. 2004). B&W Y-12 contends that Ruther was not qualified for the position, nor can she show that she was treated differently than similarly situated males.

Ruther responds that her welding time was interrupted for long periods, sporadic, haphazard, and qualitatively different from Riordan. She contends that her welding instructor was a member of the "old boys club" who didn't like her, was hypercritical, and exhibited an "underlying tone of anger" toward her.

The record shows that Ruther received a total of 46 evaluations that rated her overall performance – three rated her "exceptional," twenty-three rated her "above

14

average," and twenty rated her "average."  Before her pregnancy, Ruther was progressing in the program on par with Riordan.  After her Declaration of Pregnancy, Ruther was removed from actual, hands-on welding, and Scott became more available to teach Riordan, who continued to improve his welding skills.  Ruther was not given the same time or quality of training received by Riordan.

B&W Y-12 argues that Riordan was not a similarly situated comparator because he never took time off to deliver or breastfeed a child.  This argument is without merit. Ruther and Riordan were of similar age and both had a high school education.  They were in the same Welder Apprenticeship Training Program and initially went through the same training.  Before Ruther was removed from actual hands-on welding training, they were progressing at a similar pace, and they shared the same instructor.  However, Ruther contends Scott refused to help her in her training, was sporadic in his teaching of her, and was dismissive and condescending toward her.  Riordan was not treated in the same manner.  Moreover, Riordan was offered "unofficial" welding training by both Scott and other welders at Y-12, while Ruther states she was forbidden from engaging in similar activities.  Viewing these facts in a light most favorable to Ruther, the court finds that she has established a *prima facie* case of gender discrimination.

B&W Y-12 argues that even if Ruther can establish a *prima facie* case, the record shows that it terminated Ruther for a legitimate, non-discriminatory reason – her failure to demonstrate adequate welding knowledge, skills, and ability.  Ruther responds that B&W Y-12's stated reason for her termination is a pretext for discrimination.

15

Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action against the employee. *Fuhr v. Hazel Park Sch. Dist.,* 710 F.3d 668, 674 (6th Cir. 2013). If the employer offers a legitimate, non-discriminatory reason, the employee then has the burden of demonstrating by a preponderance of the evidence that the proffered reason is merely pretext. *Id.* at 675. "Pretext" may be shown either directly by persuading the trier of fact that a discriminatory reason motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Manzer v. Diamond Shamrock Chems Co.,* 29 F.3d 1078, 1082 (6th Cir. 1994). A plaintiff must produce sufficient evidence from which a jury could reasonably reject the employer's explanation and infer that the employer intentionally discriminated against the plaintiff. *Johnson v. Kroger Co.,* 319 F.3d 858, 866 (6th Cir. 2003). At the summary judgment stage, the court is to determine whether there is sufficient evidence to create a genuine issue of material fact to present to the jury. *Macy v. Hopkins Co. Sch. Bd. Of Ed.,* 484 F.3d 357, 364 (6th Cir. 2007).

Ruther has presented evidence that she came into the Welder Apprenticeship Program with excellent credentials. She and Riordan were progressing at a similar pace prior to Ruther's pregnancy. After returning from leave, Scott was sporadic in his teaching, was dismissive, was hypercritical of her, and exhibited anger toward her. He did not demonstrate the same attitude toward Riordan. Riordan was allowed to perform "unofficial" welding training, while Ruther was prohibited from welding outside the test

16

shop.  Ruther has also presented evidence that her PIP was unreasonable and that she was set up to fail.

The court finds Ruther has established a *prima facie* case of discrimination and she has established that there are material issues of fact in dispute whether B&W Y-12's stated reason for her termination is pretext.  Since the trial court is not to resolve issues of fact in deciding a motion for summary judgment, the determination of whether the circumstances give rise to an inference of discrimination must be determined by a jury in this case.  It is not the province of the court to decide what inferences should be drawn from the evidence.  *Southmayd v. Apria Healthcare Inc.,* 412 F. Supp. 2d 848, 862-63 (E.D. Tenn. 2006).  Accordingly, the court finds that B&W Y-12 is not entitled to summary judgment on Ruther's claim of gender discrimination**.**

## VI.  Pregnancy Discrimination

Under the Pregnancy Discrimination Act provisions of Title VII, discrimination because of or on the basis of pregnancy, childbirth, or related medical conditions is defined as a kind of sex discrimination and is prohibited.  *Tysinger v. Police Dep't of City of Zanesville,* 463 F.3d 569, 572 (6th Cir. 2006).   Under the Act, an unlawful employment practice occurs whenever pregnancy alone is a motivating factor for an adverse employment action.  *Payne v. Goodman Mg. Co. LP,* 726 F.Supp.2d 891, 904 (E.D.Tenn. 2010).  To establish a *prima facie* case of pregnancy discrimination, Ruther must establish that (1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision.  *Megivern v. Glacier Hills Inc.,* 519

17

Fed. Appx. 385, 395 (6th Cir. 2013). B&W Y-12 contends that Ruther cannot provide any evidence supporting her claim that the termination of her employment in August 2012 was related to her pregnancy in 2010. B&W Y-12 argues that it is entitled to summary judgment because the time between when it learned of Ruther's pregnancy and her later termination is insufficient to establish a nexus between the two.

A plaintiff can prove disparate treatment either by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic or by using the burden shifting framework set forth in *McDonald Douglas*. *Young v. UPS,* 135 S.Ct. 1338, 1345 (2015); *Asmo v. Keane,* 471 F.3d 588, 592 (6th Cir. 2006). The 1978 Pregnancy Discrimination Act amended Title VII, and specifies that Title VII's term "because of sex" includes "because of or on the basis of pregnancy, childbirth, or related medical conditions." *Id.* The Act also says that

> Women affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . .

*Id.* at 1344-45. Lactation and breastfeeding are "medical conditions" "related" to "pregnancy and childbirth." 42 U.S.C. § 2000e(k).

In the context of summary judgment, the court examines the evidence in the light most favorable to the non-moving party. The court finds that Scott's treatment of Ruther after she announced her pregnancy and continuing upon her return from leave is sufficient to call into question Scott's motives regarding her training and evaluations. Finally, while the temporal proximity between Ruther's pregnancy in 2010 and her termination in 2012 is not sufficient, standing alone, to prove pretext, the record shows

18

that Ruther and Riordan were progressing at a similar pace prior to Ruther's pregnancy. After returning from pregnancy leave, Ruther was presented with a PIP that she considered unreasonable, setting her up for failure. All of this evidence taken together and considered in a light most favorable to Ruther, indicates that B&W Y-12's stated reasons for terminating Ruther could be found to be a pretext for pregnancy discrimination. Accordingly, the court finds that B&W Y-12 is not entitled to summary judgment on Ruther's claim of pregnancy discrimination.

## VII.  Retaliation

To establish a *prima facie* case for retaliation under Title VII, Ruther must demonstrate (1) she engaged in activity protected by Title VII; (2) her exercise of protective rights was known to B&W Y-12; (3) B&W Y-12 thereafter took adverse employment action against her; and (4) there was a causal connection between her protected activity. *Wade v. Automation Personnel Servs. Inc.,* 612 Fed. Appx. 291, 300 (6th Cir. 2015). Ruther must show that "but for" her protected activity, her employment would not have been terminated. *EEOC v. New Breed Logistics,* 783 F.3d 1057, 1070 (6th Cir. 2015).

Here, the record shows that Ruther called the Ethics Hotline on August 2, 2011 to complain about Green's decision not to allow her to weld while she was breastfeeding. This claim was resolved and Ruther resumed welding on September 28, 2011. On April 7, 2012, Ruther went on FMLA leave for four weeks. Ruther was placed on a PIP on May 2, 2012. Scott reported that Ruther failed to successfully complete the PIP, and she was placed on administrative leave on June 5, 2012. On June 21, 2012, the JATC voted

19

to terminate Ruther's apprenticeship. On July 3, 2012, Ruther called the Ethics Office and stated that she was being discriminated against based on her pregnancy. The Ethics Office contacted Labor Relations and asked that Ruther's employment not be terminated until the investigation was completed. Ruther was eventually terminated on August 20, 2012.

The court finds that Ruther has presented insufficient evidence to establish an inference of retaliation for her complaints to the Ethics Office. First, the August 2, 2011 complaint occurred over a year before Ruther was terminated, and there is no further evidence in the record to support a claim of retaliation. Second, the July 3, 2012 complaint occurred after the JATC voted to terminate Ruther's apprenticeship on June 21, 2012. While Ruther was not terminated until August 20, 2012, the decision to terminate her apprenticeship had already been made. Therefore, she cannot establish a causal connection between her protected activity and the termination of her apprenticeship. Ruther's conclusory allegations, based entirely on her own speculation and self-serving testimony, are insufficient to demonstrate any genuine issue of material fact as to her retaliation claim. *See Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) ("mere personal beliefs, conjecture and speculation are insufficient" to state a claim for discrimination.) Accordingly, the court finds that B&W Y-12 is entitled to summary judgment on Ruther's claim of retaliation, and the claim will be **DISMISSED.**

## VIII.  Conclusion

In light of the foregoing discussion, B&W Y-12's motion for summary judgment [R. 23] is **GRANTED in part and DENIED in part:**  The motion is **GRANTED** as to Ruther's claim for retaliatory discharge, and that claim is **DISMISSED.**  The motion is **DENIED** as to Ruther's claims for gender and pregnancy discrimination under Title VII, and those claims will proceed to trial.

Defendant's motion to strike statements contained in the affidavit of Terry Beach [R.31] is **DENIED.**

Plaintiff's motion to file a supplement to her summary judgment response [R. 53] is **DENIED AS MOOT.**

**IT IS SO ORDERED.**

_____
**UNITED STATES DISTRICT JUDGE**

21